# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| |  |
|---|---|
| **JENS PORUP,**  Plaintiff,  v.  **CENTRAL INTELLIGENCE AGENCY,**  Defendant. | Case No. 17-cv-72 (CRC) |

## MEMORANDUM OPINION

It has been nearly 45 years since the Church Committee exposed the Central Intelligence Agency's ("CIA") participation in plots to assassinate several foreign leaders in the 1960s and since President Ford responded by issuing the first of a series of executive orders prohibiting the U.S. government from engaging in assassination. Yet, curiosity in that chapter of the CIA's history—and speculation that it might not have closed—apparently continues.

Plaintiff Jens Porup lodged a Freedom of Information Act ("FOIA") request seeking any documents in the CIA's files discussing the agency's use of poison to carry out assassinations. After initially declining to process Porup's request, the agency produced responsive documents with withholdings under several FOIA exemptions. Production now complete, the CIA moves for summary judgment. Porup opposes on the ground that the agency is liable for engaging in an unlawful "pattern or practice" of refusing to adjudicate FOIA requests for records concerning activities that the CIA may not legally undertake. He also challenges narrow aspects of the agency's searches and withholdings. Finding no genuine dispute of material fact as to Porup's remaining challenges, the Court will grant the Government's motion and close the case.

## I. Background

On May 1, 2015, Mr. Porup submitted a FOIA request to the CIA seeking "[a]ny and all documents relating to CIA use of poison for covert assassination." Am. Compl. ¶ 17; Gov. Mot. Summ. J., Exh. 1 at 2 [hereinafter "FOIA Correspondence"]. Porup later clarified that his request "refer[red] to the CIA from its inception to its present day." FOIA Correspondence 8. The CIA issued a "final response" on May 21, 2015, in which it directed Porup to "[p]lease refer to Executive Order 12333 which describes the conduct of intelligence activities, citation 2.11, which pertains to the prohibition on assassinations." Id. at 2.[1]

Porup sent a dozen follow-ups, in which he claimed that the agency's response "contradict[ed] material that is already in the public record"—specifically, the agency's purported public acknowledgement that it had engaged in covert assassinations in response to the 1975 investigation of the Senate Select Committee to Study Governmental Operations with Respect to Intelligence Activities ("Church Committee"). Id. at 5, 7; Am. Compl. ¶¶ 6–8, 22. The agency construed these follow-ups as requests for an appeal, which it declined to process. FOIA Correspondence 10, 12.

On January 12, 2017, Porup filed suit in this Court seeking declaratory and injunctive relief under FOIA. The CIA reassessed Porup's request and determined that responsive records, predating the 1981 government-wide prohibition on assassination, may exist. Gov. Mot. Summ. J., Exh. 2 ¶ 8 [hereinafter "Shiner Decl."]. Based on a broadened reading of Plaintiff's request,

---

[1] As relevant here, the 1981 Executive Order provides that "[n]o person employed by or acting on behalf of the United States Government shall engage in, or conspire to engage in, assassination." Exec. Order No. 12,333, 46 Fed. Reg. 59,941, 59,952 (Dec. 4, 1981). This executive order expanded on ones issued in 1976 and 1978 prohibiting U.S. government involvement in assassinations. See Exec. Order No. 11,905, 41 Fed. Reg. 7,703 (Feb. 18, 1976); Exec. Order No. 12,036, 43 Fed. Reg. 3,674 (Jan. 24, 1978).

the agency determined that 39 documents that were initially deemed nonresponsive were in fact potentially responsive. Id. ¶¶ 8, 14–15, 19.

During processing, the CIA realized that 22 of those documents, owned by the National Archives and Records Administration ("NARA"), were set to be included in a separate government-wide declassification effort pursuant to the President John F. Kennedy Assassination Records Collection Act of 1992, 42 U.S.C. § 2107 (note). Id. ¶ 19. After NARA posted these documents on its public website, the CIA processed the remaining 17 potentially responsive records. The CIA released some 2,000 pages of documents in full or in part to Porup and withheld the rest under FOIA Exemptions 1, 3, and 6. Def. Mot. Summ. J. 3. The Government then moved for summary judgment.

## II. Legal Standard

"FOIA cases typically and appropriately are decided on motions for summary judgment." Defenders of Wildlife v. U.S. Border Patrol, 623 F. Supp. 2d 83, 87 (D.D.C. 2009). In deciding a motion for summary judgment, the Court assumes the truth of the non-movant's evidence and draws all reasonable inferences in the non-movant's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

Under FOIA, agencies are generally required to make "promptly available" records that are "reasonably describe[d]" in a request that "is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed." 5 U.S.C. § 552(a)(3)(A). "To prevail on summary judgment, . . . the defending 'agency must show beyond material doubt [ ] that it has conducted a search reasonably calculated to uncover all relevant documents.'" Morley v. CIA, 508 F.3d 1108, 1114 (D.C. Cir. 2007) (quoting Weisberg v. DOJ, 705 F.2d 1344, 1351 (D.C. Cir. 1983)).

3

FOIA also contains a set of exceptions to an agency's general obligation to provide government records to the public. See 5 U.S.C. § 552(b). FOIA "mandates a strong presumption in favor of disclosure," and its "statutory exemptions, which are exclusive, are to be 'narrowly construed.'" Nat'l Ass'n of Home Builders v. Norton, 309 F.3d 26, 32 (D.C. Cir. 2002) (quoting Dep't of Air Force v. Rose, 425 U.S. 352, 361 (1976)). The government therefore bears the burden of establishing that the claimed FOIA exemptions apply. ACLU v. Dep't of Defense, 628 F.3d 612, 619 (D.C. Cir. 2011). It may satisfy this burden through declarations by agency personnel that describe the justifications for its withholdings in "specific detail, demonstrat[ing] that the information withheld logically falls within the claimed exemption." Id. Agency affidavits will not warrant summary judgment if the plaintiff puts forth contrary evidence or demonstrates the agency's bad faith. Id.

### III. Analysis

The parties have narrowed the scope of the disputed issues to: (1) Porup's claim that the CIA has engaged in an unlawful "pattern or practice" of categorically refusing to process certain FOIA requests; (2) Porup's two narrow challenges to aspects of the adequacy of the CIA's searches; and (3) Porup's challenge to the CIA's withholdings under Exemption 3 and the National Security Act. The Court will consider each issue in turn.

#### A. "Pattern or Practice"

Porup first alleges that the CIA "maintain[s] a pattern or practice of refusing to process requests regarding conduct in which it claims it does not and cannot engage." Am. Compl. ¶¶ 14, 26. According to Porup, the CIA has, over the last twelve years, responded to a wide variety of FOIA requests—spanning requests for information concerning "what measures were taken over the last two years to stop cocaine trafficking from Col[o]mbia to the U.S." to "covert

activities conducted within the United States of America"—with a form response indicating that it was legally prohibited from engaging in the type of conduct that would be implicated by the records sought, without conducting a search for a responsive records. Id. ¶¶ 15–16.[2] Porup claims that such "[a] policy, practice, or standard operating procedure of uniformly refusing to even process a properly described FOIA request (to say nothing of refusing to process an administrative appeal) is in violation of FOIA." Id. ¶ 27.

FOIA permits injunctive relief for "a claim that an agency policy or practice will impair the party's lawful access to information in the future." Payne Enterprises, Inc. v. United States,

---

[2] The amended complaint avers that the following FOIA requests also met a similar response from the agency:

(1) domestic surveillance conducted on members of the U.S. armed forces;
(2) "phone phreaks" and "blue boxes";
(3) "copies of all security/surveillance tape of the events that took place at or near the Pentagon on September 11, 2001";
(4) "all files on the Seniors for Kennedy organization from 1959–1963";
(5) "all files on the National Council for Senior Citizens from 1963–1978";
(6) "any all records pertaining to the group associated with Amnesty International-USA" known as "Internal Reform Now!", "IRN!", "Reform Slate", or "Reform";
(7) domestic surveillance of the Texas Civil Rights Project;
(8) correspondence between the CIA and other federal and local government agencies regarding the fugitive Joseph Coleman Pannell;
(9) documentation related to incidents/events occurring on or around the World Trade Center buildings in the six weeks prior to September 11, 2001;
(10) "records indexed to the moniker 'Oxblood Ruffin,' an online entity associated with the site 'Hacktivismo", and a self-declared 'hacktivist'";
(11) "CIA files on the Bloods and the Crips Gangs";
(12) "information or records on a wire transfer which left Central Bank of Nigeria bound for James M. Cratty that arrived at Citibank New York, New York, on April 4, 2006, as a diplomatic transfer";
(13) records regarding the "flight and crash of an unknown aircraft or meteor in the state of Nevada on April 18, 1962"; and
(14) records involving several domestic political campaigns and/or organizations.

Am. Compl. ¶ 15.

837 F.2d 486, 491 (D.C. Cir. 1988) (emphasis omitted). Plaintiffs seeking to make out a so-called "pattern or practice claim" must establish that "an agency's refusal to supply information evidences a policy or practice of delayed disclosure or some other failure to abide by the terms of the FOIA." Id.; see also Muttitt v. Dep't of State, 926 F. Supp. 2d 284, 293 (D.D.C. 2013). The focus of the "policy or practice" doctrine is "*wholly unjustified*" agency conduct, as opposed to "merely isolated mistakes by agency officials." Payne Enterprises, 837 F.2d at 489, 491 (emphasis added); see also Judicial Watch, Inc. v. Dep't of Homeland Sec., 895 F.3d 770, 778 (D.C. Cir. 2018); Cause of Action Inst. v. Eggleston, 224 F. Supp. 3d 63, 74 (D.D.C. 2016); Scudder v. CIA, 281 F. Supp. 3d 124, 129 (D.D.C. 2017).

The Government argues that Porup's "pattern or practice" claim is mooted by new "internal guidance" that was issued by the agency after his initial FOIA request but prior to his filing of this lawsuit. Shiner Decl. ¶ 18. That guidance "generally instruct[s] that the Agency should not decline to process requests solely because they pertain to activities or issues that are beyond the scope of the Agency's primary mission." Id. Mr. Porup concedes that the agency's new policy, if sufficiently supported by the record, would moot his "pattern or practice" claim. See Pl. Opp. 6–7. He complains, however, that there is insufficient evidence of the new policy. See id. at 7–10.

"A case might become moot if subsequent events ma[ke] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc., 528 U.S. 167, 189 (2000) (quoting United States v. Concentrated Phosphate Export Ass'n, 393 U.S. 199, 203 (1968)). When "the intervening event is of the defendant's own doing," courts must "examine whether the defendant's voluntary cessation of the challenged action truly renders the case moot." Am. Freedom Def. Initiative v.

6

WMATA, 901 F.3d 356, 362 (D.C. Cir. 2018), cert. denied, 139 S. Ct. 2665 (2019) (internal quotation marks and alterations omitted). Generally, that will only be the case where "the party urging mootness demonstrates that '(1) there is no reasonable expectation that the alleged violation will recur,' and '(2) interim relief or events have completely or irrevocably eradicated the effects of the alleged violation.'" Nat'l Black Police Ass'n v. District of Columbia, 108 F.3d 346, 349 (D.C. Cir. 1997) (quoting Los Angeles Cty. v. Davis, 440 U.S. 625, 631 (1979)).

The Government has met its burden here. The new policy is materially different than the challenged practice; the CIA has not simply "renewed the challenged conduct in a new form." Am. Freedom Def. Initiative, 901 F.3d at 362; see also Zukerman v. United States Postal Serv., 384 F. Supp. 3d 44, 55 (D.D.C. 2019) (concluding that plaintiff's claims were moot where there "key distinctions between the two regimes"). To the contrary, Ms. Shiner flatly attests that "[h]ad this additional guidance been available at the time of the initial request, and the processors had engaged in the appropriate, case-specific analysis described above, the Agency's initial response would have been different." Shiner Decl. ¶ 18. Porup does not challenge her characterization of the new guidance. Nor has he presented any "evidence indicating that the challenged [policy] likely will be reenacted." Nat'l Black Police Ass'n, 108 F.3d at 349; see also Zukerman, 384 F. Supp. 3d at 56 (noting the lack of such evidence in finding the plaintiff's claims moot).

Porup instead fixates on the fact that the Government has not provided a copy of the internal guidance implementing the new FOIA policy. He invokes the best evidence rule, which provides that generally, in a trial, "[a]n original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise." Pl. Opp. 8

7

(quoting Fed. R. Evid. 1002).[3]  "In requiring litigants to prove the contents of a writing by introducing the writing itself, the rule guards against inaccuracy, fraud, and incompleteness." United States v. Davis, 596 F.3d 852, 858 n.4 (D.C. Cir. 2010).  "This is a rule of preference, not a solid bar on secondary evidence." U.S. ex rel. El-Amin v. George Washington Univ., 522 F. Supp. 2d 135, 145 (D.D.C. 2007).

Porup misconceives the scope of the best evidence rule.  As the advisory committee's notes explain, "an event may be proved by nondocumentary evidence, *even though a written record of it was made*." Fed. R. Evid. 1002 advisory committee's note to 1972 proposed rules (emphasis added).  It is only where "the event *is sought to be proved by the written record*, the rule applies." Id. (emphasis added).  "For example," the advisory committee explained, "payment may be proved without producing the written receipt which was given." Id.

So too here.  The existence of an agency policy may be proved by a declaration from an agency official, even if a written record of the policy exists. See, e.g., Jinks-Umstead v. England, No. 99-cv-2691, 2005 WL 3312947, at *5 (D.D.C. Dec. 7, 2005) ("[A]ny witness with knowledge of facts that exist independent of the contents of a writing . . . may testify without raising an issue under Rule 1002." (quoting Wright & Gold § 7184) (second alteration in original)); Lucas v. Paige, No. 01-cv-2393, 2004 WL 7333686, at *3 (D.D.C. Sept. 28, 2004) ("[The witness's] testimony that he received certain complaints is not barred because of the possibility that documents pertaining to those complaints may exist."); United States v. Smith, 804 F.3d 724, 730 (5th Cir. 2015) ("It is well-established that Rule 1002 does not apply in

---

[3] The best evidence rule contains several exceptions, none of which apply here.  See Fed. R. Evid. 1004, 1006–07.

8

situations where the mere existence of an independent factual condition is sought to be proved, even if the condition is contained in or effectuated through a writing.").

In any case, it is well established that summary judgment evidence need not be "in a form that would be admissible at trial," so long as it is "capable of being converted into admissible evidence." Gleklen v. Democratic Cong. Campaign Comm., Inc., 199 F.3d 1365, 1369 (D.C. Cir. 2000); see also Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."). In the FOIA context, a declaration suffices under Rule 56 so long as the declarant "attests to [her] personal knowledge of the procedures used in handling a FOIA request and [her] familiarity with the documents in question." Bernegger v. Exec. Office for United States Attorneys, 334 F. Supp. 3d 74, 85 (D.D.C. 2018) (internal quotation marks and alterations omitted).

The declaration of Ms. Shiner, a veteran Information Review Officer in the Litigation Information Review Office of the CIA, attesting to the implementation of the new mandatory policy for processing of FOIA requests clears this standard. Her declaration attests that under the new guidance, "processors are *required* to engage in context dependent inquiry as to whether a search may be possible, and whether the Agency's records repositories are likely to contain responsive materials" and that "the guidance provided *mandates* that this fact specific analysis will be applied to requests moving forward, and pursuant to the guidance described above, Agency personnel *should not* decline to process requests solely because the matters at issue are beyond the scope of the Agency's primary mission." Shiner Decl. ¶ 18 (emphasis added). Porup points to nothing in the record that would call Ms. Shiner's attestation into question. See, e.g., SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991) ("Agency affidavits are

accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." (internal quotation marks omitted)). Accordingly, the Government has met its burden to establish that the challenged practice "could not reasonably be expected to recur," Laidlaw, 528 U.S. at 189, and Plaintiff's "pattern or practice" claim is thus moot.[4]

    B. Adequacy of Searches

The CIA determined—at least given that U.S.-government assassinations (by poison or otherwise) have been prohibited since 1981—that responsive records would likely pertain to events and operations occurring in the 1960s and documents dating from the 1970s. Shiner Decl. ¶ 14. The agency identified two record systems likely to contain such records and searched them electronically with terms that were developed after consulting with subject-matter experts. Id. ¶¶ 14–15.

Porup raises "two narrow challenges" to the adequacy of the CIA's searches. Pl. Opp. 4, 14–15. First, Porup contends that "the CIA has failed to demonstrate that it utilized all search terms reasonably likely to locate the records sought." Id. at 15. Second, Porup challenges the adequacy of the agency's supplemental search of its operational files under the CIA Information Act. See id. at 14–15; Pl. Sur-Reply 5–6.[5]

---

[4] This case can be distinguished from Payne Enterprises, where the Circuit refused to conclude that the plaintiff's "pattern or practice" claim was moot based on a low-level agency official's affidavit "weak[ly] assur[ing]" "that the contested practice will not be reinstated." 837 F.2d at 492. The official's affidavit was "founded on her own inference from" a letter and the official "d[id] not pretend to speak for her superiors, nor have they signed affidavits pledging future compliance." Id. Here, Ms. Shiner is a senior CIA FOIA official speaking directly for the entire agency in explaining a mandatory agency-wide policy for its processing of FOIA requests.

[5] Plaintiff initially challenged the agency's failure to search its operational files as inconsistent with the terms of the CIA Information Act, 50 U.S.C. § 3141(a). Acknowledging

*1. Search Terms Used in Initial Searches*

Porup points out that the CIA provided only examples of the search terms that it used, rather than all search terms—possibly including the names of operations which have yet to be publicly disclosed. Pl. Opp. 15. But, the agency is not required to "set forth with meticulous documentation the details of an epic search for the requested records." Perry v. Block, 684 F.2d 121, 127 (D.C. Cir. 1982). The agency declaration provided a detailed list of many of the terms that it used, which included "poison," "covert," "assassination," "Church Committee," "Rockefeller Commission," "family jewels," "ZR/RIFLE," "AMLASH," and "Mongoose." Shiner Decl. ¶ 15. By sworn declaration, these terms were determined to be those "most reasonably likely to return responsive records" and "were identified by subject matter experts as referring to operations or Congressional investigations the substance of which was likely to be responsive to the request." Id.

Porup has not identified anything in the record to call into question this representation. See Perry, 684 F.2d at 127 ("[I]n the absence of countervailing evidence or apparent inconsistency of proof, affidavits that explain in reasonable detail the scope and method of the search conducted by the agency will suffice to demonstrate compliance with the obligations imposed by the FOIA."); cf. Mobley v. CIA, 806 F.3d 568, 583 (D.C. Cir. 2015) ("In the absence of any supporting evidence, Mobley's argument that [other] files . . . must have existed . . . fails to raise a material question of fact regarding the adequacy of the search."). Accordingly, the Court concludes that there is no genuine dispute of material fact as to whether the agency's search terms were adequate.

---

the oversight, the agency conducted a supplemental search of its operational files to the extent necessary to comply with its obligations under FOIA and the CIA Information Act.

### 2. *Supplemental Search of Operational Files*

The CIA Information Act generally exempts CIA operational files from the search, review, publication, and disclosure requirements of FOIA. See 50 U.S.C. § 3141(a); Talbot v. U.S. Dep't of State, 315 F. Supp. 3d 355, 369 (D.D.C. 2018) (Cooper, J.). The Act defines "operational files" to include "files of the National Clandestine Service which document the conduct of foreign intelligence or counterintelligence operations or intelligence or security liaison arrangements or information exchanges with foreign governments or their intelligence or security services." 50 U.S.C. § 3141(b)(1). However, "exempted operational files shall continue to be subject to search and review for information concerning the specific subject matter of an investigation by the congressional intelligence committees," or other specifically enumerated investigative offices, "for any impropriety, or violation of law, Executive order, or Presidential directive, in the conduct of an intelligence activity." Id. § 3141(c)(3).

Porup argued—and the CIA apparently agreed—that the agency was obligated to search its operational files because his FOIA request may implicate specific subject matter at issue in the 1975 Church Committee investigation. Pl. Opp. 14–15; Def. Supp. Br., Exh. A ¶¶ 3–4 [hereinafter "Shiner Supp. Decl."]. The CIA thus conducted a supplemental search of its operational files for information concerning "the specific subject matter of" the Church Committee investigation, 50 U.S.C. § 3141(c)(3), which turned up no responsive documents, see Shiner Supp. Decl. ¶¶ 3–4, 6–8. Plaintiff now challenges the adequacy of that search.[6]

---

[6] Porup contends that the agency was obligated to establish that his FOIA request did not implicate information concerning other non-public committee investigations. Pl. Sur-Reply 6. Besides citing no authority for this proposition, Porup has failed to make out a genuine dispute of material fact as to whether any other committee investigation concerned the "specific subject matter" of his FOIA request.

By the terms of the statute, the CIA is obligated to search its operational files when three conditions are met. "First, the entity that performed the investigation must qualify as a 'congressional intelligence committee'" or another listed entity. Talbot, 315 F. Supp. 3d at 369 (quoting Morley, 508 F.3d at 1116). "Second, the request must concern 'the specific subject matter' of the investigation." Id. (quoting Morley, 508 F.3d at 1117). "Finally, the investigation must be one into an 'impropriety or violation of law, Executive order, or Presidential directive, in the conduct of an intelligence activity.'" Id. (quoting Morley, 508 F.3d at 1117). The parties do not dispute that the Church Committee investigation meets the first and third prongs of this test. The only dispute is whether the agency satisfied the second prong.

"[T]he requirement of § 431(c)(3) that a FOIA request concern 'the specific subject matter of an investigation' is satisfied where the investigating committee would have deemed the records at issue to be central to its inquiry." Morley, 508 F.3d at 1118; see also Sullivan v. CIA, 992 F.2d 1249, 1255 (1st Cir. 1993) ("[A] pivotal requirement of section 431(c)(3) is that, to be extractable, the information requested must concern the specific subject matter of the official investigation[.]"). Thus, "information that merely 'surfaced in the course of the investigation' should not trigger the § 431(c)(3) exception." Morley, 508 F.3d at 1118 (quoting H.R. Rep. No. 98-726, at 31, reprinted in 1984 U.S.C.C.A.N. 3741, 3769)).

The agency's supplemental search was adequate under this standard. It encompassed all operational files created on or before December 31, 1980, which was four years after the Church Committee issued its final report. See Def. Supp. Br. 4; Shiner Supp. Decl. ¶ 4; Select Comm. to Study Gov't Operations with Respect to Intelligence Activities, Foreign & Military Intelligence, S. Rep. 94-755 (1976). Porup contends that searching only this timeframe was inadequate because "records about CIA involvement in an assassination in 2018, for instance" *could have*

13

*been* deemed central to the Church Committee's inquiry, "had it known of such a record." Pl. Sur-Reply 5.

However, Plaintiff misconceives the scope of 50 U.S.C. § 3141(c). Section 3141(c) does not require the CIA to search its operational files for all information, including information on events occurring decades later, that could *hypothetically* have been deemed central to a congressional committee's investigation. Section 3141(c) mandates only disclosure of "information central to the committee's '*direct* investigation.'" Morley, 508 F.3d at 1118 (quoting Sullivan, 992 F.2d at 1255) (emphasis added). The Church Committee "posed a targeted inquiry investigating the performance of the intelligence agencies surrounding a particular event." Id.

The CIA concluded that a search of all operational files that were created four years past the Church Committee's final report would capture the "subset of the requested records," Talbot, 315 F. Supp. 3d at 370, that would have been deemed central to the Church Committee's inquiry—*i.e.*, those "that would have existed at the time of the Committee's review" *or* were "created in an attempt to address the concerns raised by the Report," Shiner Supp. Decl. ¶ 4. Although it is possible that a document created after 1980 could pertain to an event directly investigated by the Church Committee, the agency "reasonably calculated" that a search of all its operational files created four years after the investigation's final report "would uncover all relevant documents." Kowalczyk v. DOJ, 73 F.3d 386, 389 (D.C. Cir. 1996) (holding that "the agency reasonably limited its search to files located at is headquarters"); see also Poitras v. Dep't of Homeland Sec., 303 F. Supp. 3d 136, 162 (D.D.C. 2018) (holding that agency reasonably limited its search to a three-month time period to capture documents about a specific encounter).

Porup also challenges the agency's search methodology. The search terms included: "poison," "covert," "assassination," "Church Committee," "Rockefeller Commission," "family jewels," "ZR/RIFLE," "AMLASH," "Patrice Lumumba," and "Mongoose." Shiner Supp. Decl. ¶ 5. Again, these terms were selected by a subject-matter expert and concern either the subject matter of Porup's request, government investigations relating to the subject, or particular covert operations. In searching the electronic records, the agency used Boolean connectors with the search to minimize false hits. Id. ¶ 6. That search turned up multiple potentially responsive documents, which were later deemed nonresponsive after a line-by-line review. Id. In searching the electronic inventory of the archival records, the agency conducted separate searches with each search term and turned up no potentially responsive records. Id. ¶ 7.

Porup again complains that the agency was obligated to indicate whether it used currently classified terms that would yield responsive records. He also maintains the agency provided an inadequate explanation of how it used Boolean connectors. Neither challenge has merit.

Ms. Shiner certified that agency personnel "selected search terms" for the supplemental search "based upon familiarity with subject of the request, and the determination that searches of the . . . operational filing systems using these terms would reasonably be expected to identify any potentially responsive documents." Id. ¶ 5. She also attested that "search specialists concluded that the search terms described above were likely to generate large numbers of false hits in these electronic systems," that therefore "search personnel used Boolean connectors to create logical search queries, searching multiple terms at once, in an effort to tailor the searches," and that "[s]each personnel concluded that such compound searches would be more efficient, prevent the searches from returning large numbers of non-responsive documents, and constitute the best method to determine whether any responsive operational files existed." Id. ¶ 6. These

15

unrebutted declarations are sufficient to establish the reasonableness of the agency's supplemental search methodology. See, e.g., Mobley, 806 F.3d at 581 ("Agency affidavits—so long as they are relatively detailed and non-conclusory—are accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." (internal quotations omitted)).

    C. <u>Withholdings Under Exemption 3 and the National Security Act</u>

As noted, the agency made withholdings under FOIA Exemptions 1, 3, and 6. Porup challenges only the agency's withholdings under Exemption 3 in conjunction with the National Security Act.[7] Pl. Opp. 4, 15–17. Exemption 3 "applies to records exempted from release under FOIA by another statute." Talbot, 315 F. Supp. 3d at 372; see 5 U.S.C. § 552(b)(3)(A)(ii). The CIA based several withholdings on the National Security Act, which broadly directs the Director of National Intelligence to "protect intelligence sources and methods from unauthorized disclosure," 50 U.S.C. § 3024(i)(1), and has been recognized as a valid Exemption 3 statute, see CIA v. Simms, 471 U.S. 159, 168 (1985).

The agency also asserted Exemption 1 over many of these withholdings. See Shiner Decl. ¶¶ 22–29, 32 & nn.2–4, 6; Gov. Mot. Summ. J., Exh. 4 [hereinafter "Vaughn Index"]. Because Porup concedes that the agency properly withheld those documents under Exemption 1, the Court need only address those documents over which the agency exclusively asserted Exemption 3 in conjunction with the National Security Act. See, e.g., Ctr. for Nat. Sec. Studies v. DOJ, 331 F.3d 918, 925 (D.C. Cir. 2003) ("Finding the [documents] protected under [one

---

[7] The agency also made withholdings under Exemption 3 in conjunction with the CIA Act. Porup does not challenge these withholdings, so the Court grants summary judgment to the Government as to them, as well as to the Government's withholdings under Exemptions 1 and 6.

16

exemption], we need not address the other exemptions invoked by the government . . . ."). Ms. Shiner's declaration identifies only two such documents. See Shiner Decl. ¶ 32 & n.7.[8]

As to those documents, Ms. Shiner attested that

> Exemption (b)(3) in conjunction with the National Security Act applies to other intelligence sources and methods of the Agency that are not covered by Exemption (b)(1), such as certain techniques used to protect Agency officers and information, and methods used to secure agency facilities. Each of these types of information directly concern intelligence sources and methods of the Agency, and are accordingly exempt from disclosure by the National Security Act.

Id. ¶ 32 (footnote omitted).[9] Ms. Shiner also represented—with respect to all of the documents withheld under Exemption 3—that "disclosure of this information would expose CIA officers and highlight capabilities and limitations of intelligence activities of the Agency, which could render them ineffective and result in harm to national security" and "could also reveal sensitive security requirements, potentially putting Agency officers at risk, and increasing the likelihood of exposure of sensitive information." Id. ¶ 33. This detailed declaration easily satisfies the

---

[8] Porup focuses on four specific withholdings in the Vaughn index. See Pl. Opp. 16–18; Vaughn Index entries 10, 14, 35, 39. However, the agency also asserted Exemption 1 and/or Exemption 3 in conjunction with the CIA Act over these withholdings, which Porup concedes was proper. See Pl. Opp. 4; Vaughn Index entries 10, 14, 35, 39. Accordingly, the Court need not address his objections under Exemption 3 in conjunction with the National Security Act. See Ctr. for Nat. Sec. Studies, 331 F.3d at 925.

[9] The CIA's Vaughn index indicates that these documents were "a summary of a report of investigation into CIA activities" and "a compilation of documents relating to CIA operational activities, including memoranda, transcripts, summaries of operational planning." Vaughn Index entries 7–8. The entries further explain that "Exemption (b)(3) (National Security Act) was asserted to protect intelligence methods and sources, locations of Agency stations or bases, and controlled access and dissemination control markings, as well as information pertaining to foreign relations or foreign activities of the United States." Id. This level of detail is more than sufficient to satisfy the agency's obligation to "adequately describe each withheld document or deletion from a released document" and "state the exemption claimed for each deletion or withheld document, and explain why the exemption is relevant." People for the Am. Way Found. v. Nat'l Park Serv., 503 F. Supp. 2d 284, 294 (D.D.C. 2007) (citation omitted).

deferential standard that courts afford agency declarations relating to Exemption 3 in matters of national security. See, e.g., Wolf v. CIA, 473 F.3d 370, 377 (D.C. Cir. 2007) (noting that courts must "give[] even greater deference to CIA assertions of harm to intelligence sources and methods under the National Security Act" than under Exemption 1); Ctr. for Nat'l Sec. Studies, 331 F.3d at 927 ("[W]e have consistently deferred to executive affidavits predicting harm to national security, and have found it unwise to undertake searching judicial review."); Sims, 471 U.S. at 175 ("[T]he Government has a compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service." (internal quotation marks omitted)). The agency is therefore entitled to summary judgment with respect to its Exemption 3 and National Security Act withholdings.

## IV. Conclusion

For the foregoing reasons, the Court concludes that the CIA has satisfied its obligations under FOIA and will grant summary judgment to the Government. A separate order follows.

DATE: March 16, 2020

CHRISTOPHER R. COOPER
United States District Judge